## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL SEEVER, Individually and for Others Similarly Situated | **Case No.** _____ |
| v. | Jury Trial Demanded |
| THE DETROIT SALT COMPANY, L.C. | FLSA Collective Action Pursuant to 29 U.S.C. § 216(b) |

## COLLECTIVE ACTION COMPLAINT

### SUMMARY

1.     Michael Seever (Seever) brings this collective action to recover unpaid wages and other damages from The Detroit Salt Company, L.C. (Detroit).

2.     Detroit employed Seever as one of its Hourly Employees (defined below).

3.     Detroit pays Seever and the other Hourly Employees by the hour.

4.     Seever and the other Hourly Employees regularly work more than 40 hours in a week.

5.     However, Detroit does not pay Seever and the other Hourly Employees for all hours worked, including overtime hours.

6.     Instead, Detroit requires Seever and the other Hourly Employees to put on safety gear and gather equipment necessary to perform their job duties, while on Detroit's premises, "off the clock."

7.      Likewise, Detroit requires Seever and the other Hourly Employees to remove and store their safety gear and other equipment, while on Detroit's premises, "off the clock" (¶¶ 6-7 together, Detroit's "pre/post shift off the clock policy").

8.      But Detroit does not pay Seever and the other Hourly Employees for the time they spend donning and doffing their safety gear and gathering and storing other equipment, "off the clock," before and after their shifts.

9.      Additionally, Detroit automatically deducts 30 minutes a day from Seever's and its other Hourly Employees' hours for so-called "meal breaks," regardless of whether they actually receive a *bona fide* meal break (Detroit's "auto-deduct policy").

10.     Thus, Detroit did not pay Seever and the other Hourly Employees for that time.

11.     But Seever and the other Hourly Employees do not actually receive *bona fide* meal breaks.

12.     Instead, Detroit requires Seever and its other Hourly Employees to remain on duty and perform compensable work throughout their shifts, and Detroit regularly subjects them to work interruptions during unpaid "meal breaks."

13.     Finally, Detroit pays Seever and the other Hourly Employees non-discretionary bonuses, including safety and production bonuses, that it excludes from their regular rates of pay for overtime purposes (Detroit's "bonus pay scheme").

14.     Detroit's pre/post shift off the clock policy, auto-deduct policy, and bonus scheme violate the Fair Labor Standards Act (FLSA) by failing to compensate Seever and the other Hourly Employees at rates of at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 in a workweek.

## JURISDICTION & VENUE

15.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

16.     This Court has personal jurisdiction over Detroit because it is a Michigan limited liability company.

17.     Venue is proper because Detroit maintains its principal place of business in Wayne County, Michigan, which is in this District and Division. 28 U.S.C. § 1391(b)(1).

## PARTIES

18.     Detroit employed Seever as a scoop operator from approximately February 2022 through February 2024.

19.     Throughout his employment, Detroit subjected Seever to its pre/post shift off the clock policy, auto-deduct policy, and bonus pay scheme.

20.     Seever's written consent is attached as **Exhibit 1**.

21.     Seever brings this collective action on behalf of himself and other similarly situated employees.

- 3 -

22.     The putative FLSA collective is defined as:

> **All hourly Detroit employees who worked during the last three years through final resolution of this matter (the "Hourly Employees").**

23.     Detroit is a Michigan limited liability company with its principal place of business in Detroit, Michigan.

24.     Detroit may be served with process through its registered agent, **Cogency Global Inc., 186 N. Main St., Fl. 2 Ste. 1, Plymouth, Michigan 48170**.

### FLSA COVERAGE

25.     At all relevant times, Detroit was an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

26.     At all relevant times, Detroit was an "enterprise" within the meaning of the FLSA. 29 U.S.C. § 203(r).

27.     At all relevant times, Detroit was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials—such as cell phones, tools, and personal protective equipment—that have been moved in or produced for commerce. 29 U.S.C. § 203(s)(1).

28.     At all relevant times, Detroit had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

29.     At all relevant times, Seever and the other Hourly Employees were Detroit's "employees" within the meaning of the FLSA. 29 U.S.C. § 203(e).

30.     At all relevant times, Seever and the other Hourly Employees were engaged in commerce or in the production of goods for commerce.

FACTS

31.     Detroit operates a "gigantic salt mine [] located 1,200 feet beneath Detroit's surface, [which] spreads out more than 1,500 acres and has over 100 miles of underground roads."[1]

32.     To meet its business objectives, Detroit employs workers, including Seever and the other Hourly Employees, to mine and process salt.

33.     For example, Detroit employed Seever as a master mechanic from approximately February 2022 through February 2024 in its Wayne County salt mine.

34.     As a master mechanic, Seever's job duties included inspecting, maintaining, and repairing equipment underground in the salt mine, including salt machines, conveyor belts, motors, and other equipment.

35.     Seever's job duties likewise included donning and doffing his safety gear and gathering and storing other equipment, on Detroit's premises, "off the clock" before and after his scheduled shifts.

_____

[1] http://detroitsalt.com (last visited October 1, 2025).

36.     Throughout his employment, Seever recorded his "on the clock" hours using the timekeeping system Detroit selects and controls.

37.     Thus, Detroit's employment records reflect the number of "on the clock" hours Seever recorded working each week.

38.     Seever regularly worked more than 40 hours a workweek.

39.     Indeed, Seever typically worked approximately 10 to 12 hours a day and 6 to 7 days a week "on the clock" (60-84 hours a workweek).

40.     But throughout his employment, Detroit did not pay Seever for all his hours worked.

41.     Instead, Detroit subjected Seever to its pre/post shift off the clock policy.

42.     Specifically, Detroit required Seever to prepare and put on safety gear (including hard hat, head lamp, ear protection, steel toed boots, safety glasses, gloves, and self-contained self-rescuer) and gather other equipment (including hand tools) fundamentally necessary to perform his underground mechanic job, on Detroit's premises and "off the clock," and without compensation.

43.     This took Seever approximately 30 minutes each workday.

44.     Seever could not perform his principal job duties in accordance with Detroit's policies, procedures, and expectations without this safety gear and other equipment.

45.     Indeed, much of the gear Seever utilized is mandated by federal regulation. *See* 29 C.F.R. § 1910.132; 30 C.F.R. § 56, *et seq*; 30 C.F.R. § 57, *et seq*.

46.     The donning of protective clothing and safety gear are therefore integral and indispensable work duties for Seever embedded and intertwined with his job duties maintaining and repairing equipment.

47.     Likewise, Detroit required Seever to travel out of the mine, remove and store his safety gear and other equipment after his shift, still on Detroit's premises, "off the clock" and without compensation.

48.     This took Seever approximately 30 minutes each workday.

49.     Seever could not perform his job duties in accordance with Detroit's policies, procedures, and expectations without removing and storing this safety gear and protective clothing and washing up each workday.

50.     The removal and storage of safety gear and other equipment are therefore integral and indispensable work duties for Seever.

51.     But under its pre/post shift off the clock policy, Detroit did not compensate him for the same.

52.     Thus, because of its pre/post shift off the clock policy, Detroit failed to pay Seever overtime wages for all his overtime hours worked during workweeks he worked more than 40 hours.

53. Further, Detroit regularly failed to provide and/or make available work free, uninterrupted meal breaks to Seever.

54. Rather, Seever spent his entire workday working on behalf of Detroit for its predominant benefit.

55. Seever and the other Hourly Employees perform their jobs under Detroit's supervision and use materials, equipment, and technology Detroit approves and supplies.

56. Detroit requires Seever and the other Hourly Employees to follow and abide by common work, time, pay, and overtime policies and procedures in the performance of their jobs.

57. Seever's and the other Hourly Employees' work must strictly adhere to the uniform standards put in place by Detroit.

58. At the end of each pay period, Seever and the other Hourly Employees receive wages from Detroit that are determined by common systems and methods that Detroit selects and controls.

59. Like Seever, the other Hourly Employees typically work approximately 10 to 12 hours a day and 6 to 7 days a week "on the clock" (60-84 hours a workweek).

60. But, just as with Seever, Detroit fails to pay them for all hours worked.

61. Detroit likewise subjects the other Hourly Employees to the same or similar pre/post shift off the clock policy it imposed on Seever.

62.     Specifically, just as with Seever, Detroit requires them to put on safety gear (including hard hat, head lamp, ear plugs, steel toed boots, safety glasses, gloves, and self-contained self-rescuer) and gather other equipment (including hand tools) fundamentally necessary to performing their jobs, "off the clock," and without compensation.

63.     And Detroit requires them to exit the mine and remove and store their safety gear and other equipment after their shifts, likewise, "off the clock" and without compensation.

64.     And like Seever, much of the gear they must utilize is mandated by federal regulation. *See* 29 C.F.R. § 1910.132; 30 C.F.R. § 56, *et seq*; 30 C.F.R. § 57, *et seq*.

65.     Thus, just as with Seever, Detroit does not pay the other Hourly Employees for this integral and indispensable work they are required to perform "off the clock" before and after their shifts.

66.     And, just as with Seever, these job duties take the other Hourly Employees approximately an hour to complete each workday.

67.     Additionally, Detroit subjects Seever and the other Hourly Employees to its common auto-deduct policy.

68.     Specifically, Detroit automatically deducts 30 minutes a workday from Seever's and the other Hourly Employees recorded hours and wages for so called "meal periods."

69. Detroit automatically deducts this time regardless of whether Seever and the other Hourly Employees actually receive full, uninterrupted, 30-minute meal periods.

70. Detroit simply assumes Seever and the other Hourly Employees receive *bona fide* meal periods each shift they work.

71. But Seever and the other Hourly Employees do not actually receive *bona fide* meal breaks.

72. Instead, Detroit requires Seever and the other Hourly Employees to remain on duty and perform compensable work throughout their shifts for Detroit's predominant benefit, including during "meal periods."

73. And Detroit subjects Seever and the other Hourly Employees to work interruptions during their unpaid "meal periods."

74. Thus, Seever and the other Hourly Employees are not free to engage in personal activities during their unpaid "meal periods."

75. Rather, during their unpaid "meal periods," Seever and the other Hourly Employees are forced to substantially perform their regular patient care job duties and responsibilities.

76. Thus, Seever and the other Hourly Employees routinely spend their unpaid "meal periods" performing work for Detroit—not these employees'—predominant benefit.

77. This unpaid time is compensable under the FLSA and Ohio law because Detroit knew, or should have known, that (1) Seever and the other Hourly Employees were performing unpaid work during their "meal periods," (2) they were interrupted with work duties during attempted "meal period," (3) they were not completely relieved of all duties during "meal periods," (4) they entirely skipped "meal periods" due to work demands, (5) "meal periods" were less than 20 consecutive minutes, (6) they were not free to engage in personal activities during their "meal periods" because of work interruptions, (7) they remained on Detroit's premises or under Detroit's supervision, and/or (8) they spent their unpaid "meal periods" substantially performing their regular patient care duties for Detroit's predominant benefit.

78. Detroit fails to exercise its duty as Seever's and the other Hourly Employees' employer to ensure these employees are not performing work that Detroit does not want performed during their unpaid "meal periods."

79. And Detroit knows Seever and the other Hourly Employees routinely perform work "off the clock" during their unpaid "meal periods" because Detroit expects and requires them to do so.

80. Seever and the other Hourly Employees have complained to Detroit's management and their supervisors about being forced to work during their unpaid "meal periods."

- 11 -

81.  Thus, Detroit required, requested, suffered, or permitted Seever and the other Hourly Employees to work during their unpaid "meal periods."

82.  Despite accepting the benefits, Detroit does not pay Seever and the other Hourly Employees for the compensable work they perform during their automatically deducted "meal periods."

83.  Thus, Seever and the other Hourly Employees routinely spend their unpaid "meal breaks" performing work for Detroit's predominant benefit.

84.  Detroit fails to exercise its duty as Seever's and the other Hourly Employees' employer to ensure these employees are not performing work that Detroit does not want performed during their unpaid "meal breaks."

85.  And Detroit knows, should know, or recklessly disregards whether Seever and its other Hourly Employees routinely perform work "off the clock" during their unpaid "meal breaks."

86.  Hence, Detroit requested, suffered, or permitted Seever and its other Hourly Employees to work during their unpaid "meal breaks."

87.  Despite accepting the benefits, Detroit does not pay Seever and its other Hourly Employees for the compensable work they perform during their automatically deducted "meal breaks."

88. Thus, under Detroit's auto-deduct policy, it does not pay Seever and the other Hourly Employees overtime wages at the required overtime rate during workweeks they work more than 40 hours.

89. Finally, Detroit does not pay Seever and the other Hourly Employees at the required premium overtime rate for all overtime hours worked.

90. Instead, Detroit pays Seever and the other Hourly Employees under its bonus pay scheme.

91. Specifically, Detroit agrees to pay and subsequently pays Seever and the other Hourly Employees non-discretionary bonuses, including safety and production bonuses, if they fulfill Detroit's eligibility criteria.

92. But Detroit excludes these non-discretionary bonuses from the Hourly Employees' regular rates of pay for overtime purposes.

93. Thus, under Detroit's bonus pay scheme, it does not pay Seever and the other Hourly Employees overtime wages at the required rates—based on all remuneration—for all hours worked in excess of 40 in a workweek.

## COLLECTIVE ACTION ALLEGATIONS

94. Seever brings his claims as a collective action under Section 216(b) of the FLSA on behalf of himself and the other Hourly Employees.

95. Like Seever, the other Hourly Employees are victimized by Detroit's pre/post shift off the clock policy, auto-deduct policy, and/or bonus pay scheme.

96.     Other Hourly Employees worked with Seever and indicated they were paid in the same or similar manner, performed similar work, and were subject to Detroit's pre/post shift off the clock policy, auto-deduct policy, and/or bonus pay scheme.

97.     Based on his experience with Detroit, Seever is aware Detroit's pre/post shift off the clock policy, auto-deduct policy, and bonus pay scheme were imposed on other Hourly Employees.

98.     The Hourly Employees are similarly situated in the most relevant respects.

99.     Even if their precise job duties and locations might vary, these differences do not matter for the purpose of determining their entitlement to overtime wages at the required premium rates.

100.     Therefore, the specific job titles or locations of the Hourly Employees do not prevent collective treatment.

101.     Rather, Detroit's pre/post shift off the clock policy, auto-deduct policy, and bonus pay scheme render Seever and the other Hourly Employees similarly situated for the purpose of determining their right to overtime wages at the required rates for all overtime hours worked.

102.     Detroit's records reflect the number of "on the clock" hours the Hourly Employees were recorded as working each week.

103. Detroit's records also show Detroit paid the Hourly Employees non-discretionary bonuses it excluded from their regular rates of pay.

104. The back wages owed to Seever and the other Hourly Employees can therefore be calculated using the same formula applied to the same records.

105. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Detroit's records, and there is no detraction from the common nucleus of liability facts.

106. Therefore, the issue of damages does not preclude collective treatment.

107. Seever's experiences are typical of the experiences of the other Hourly Employees.

108. Seever has no interest contrary to, or in conflict with, the other Hourly Employees that would prevent collective treatment.

109. Like each Hourly Employee, Seever has an interest in obtaining the unpaid wages owed under federal law.

110. Seever and his counsel will fairly and adequately protect the interests of the Hourly Employees.

111. Seever retained counsel with significant experience in handling complex collective action litigation.

112. Absent this collective action, many Hourly Employees will not obtain redress for their injuries, and Detroit will reap the unjust benefits of violating the FLSA.

113.   Further, even if some of the Hourly Employees could afford individual litigation, it would be unduly burdensome to the judicial system.

114.   Indeed, the multiplicity of actions would create hardship to the Hourly Employees, the Court, and Detroit.

115.   Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

116.   The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual members.

117.   Among the common questions of law and fact are:

   a.   Whether Detroit imposed its pre/post shift off the clock policy on the Hourly Employees;

   b.   Whether Detroit's pre/post shift off the clock policy deprived the Hourly Employees of overtime compensation for overtime hours worked;

   c.   Whether Detroit engaged in a policy and practice of automatically deducting 30 minutes a day from the Hourly Employees' recorded time for "meal breaks";

   d.   Whether Detroit requested, suffered, or permitted the Hourly Employees to work during their unpaid "meal breaks";

e.   Whether Detroit paid the Hourly Employees non-discretionary bonuses;

f.   Whether Detroit engaged in a policy or practice of failing to include non-discretionary bonuses in the Hourly Employees' regular rates of pay;

g.   Whether Detroit failed to pay the Hourly Employees overtime wages at the required premium rates—based on all remuneration—for all overtime hours worked;

h.   Whether Detroit's decision not to pay the Hourly Employees overtime wages at the required rates—based on all remuneration—for all overtime hours worked was made in good faith; and

i.   Whether Detroit's violations were willful.

118.   There are many similarly situated Hourly Employees who have been denied overtime pay at the required rate—based on all remuneration—for all overtime hours worked, in violation of the FLSA, who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

119.   The Hourly Employees are known to Detroit, are readily identifiable, and can be located through Detroit's business and personnel records.

## DETROIT'S VIOLATIONS WERE WILLFUL

- 17 -

120.    Detroit knew it employed the Hourly Employees.

121.    Detroit knew it was subject to the FLSA's overtime provisions.

122.    Detroit knew Seever and the other Hourly Employees were its non-exempt employees entitled to overtime pay.

123.    Detroit knew the FLSA required it to pay non-exempt employees, including Seever and the other Hourly Employees, overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for all hours worked after 40 a workweek.

124.    Detroit knew Seever and each Hourly Employee worked more than 40 hours in at least one workweek during the last 3 years because Detroit recorded their "on the clock" hours via its timekeeping system.

125.    Detroit knew it paid the Hourly Employees according to its pre/post shift off the clock policy.

126.    Detroit knew it had a duty to ensure the Hourly Employees were not performing work "off the clock" (without pay).

127.    Detroit knew it required the Hourly Employees to don and doff safety gear and gather and store other equipment, "off the clock."

128.    Detroit knew it controlled the Hourly Employees' work procedures.

129.    Detroit knew the Hourly Employees' mandatory "off the clock" work was a fundamental requirement of their jobs with Detroit.

130.   Detroit knew the Hourly Employees' mandatory "off the clock" work was an integral and indispensable requirement of their principal job duties with Detroit.

131.   Detroit knew the Hourly Employees routinely performed this daily, required "off the clock" work for Detroit's predominant benefit.

132.   In other words, Detroit knew the Hourly Employees performed compensable work "off the clock" and without compensation.

133.   Detroit knew it deducted 30 minutes a day from Hourly Employees' for so-called "meal breaks," despite them not receiving *bona fide* meal breaks.

134.   Detroit knew it paid Seever and the other Hourly Employees non-discretionary safety and production bonuses.

135.   Detroit knew these non-discretionary bonuses were not included in Seever's and the other Hourly Employees' regular rates of pay for the purpose of calculating their overtime rates of pay.

136.   And Detroit knew the FLSA required it to pay Seever and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

137.   Detroit knew Seever and the other Hourly Employees regularly worked in excess of 40 hours a workweek.

138.   Thus, Detroit knew, should have known, or recklessly disregarded whether it failed to pay Seever and the other Hourly Employees at least 1.5 times their regular

rates of pay—based on all remuneration—for all the hours they worked in excess of 40 a workweek.

139.   Detroit's failure to pay Seever and the other Hourly Employees overtime at the required rates—based on all remuneration—for all overtime hours worked was neither reasonable, nor was this decision made in good faith.

140.   Detroit knowingly, willfully, and/or in reckless disregard of the FLSA carried out its unlawful auto-deduct policy, pre/post shift off the clock policy, and bonus pay scheme that deprived Seever and the other Hourly Employees of overtime wages at the required rate of pay—based on all remuneration—for all hours worked after 40 a workweek, in violation of the FLSA.

**CAUSE OF ACTION**
**FAILURE TO PAY OVERTIME UNDER THE FLSA**
**(COLLECTIVE ACTION)**

141.   Seever brings his FLSA claim as a collective action on behalf of himself and the other Hourly Employees pursuant to 29 U.S.C. § 216(b).

142.   Detroit violated, and is violating, the FLSA by employing non-exempt employees, such as Seever and the other Hourly Employees, in a covered enterprise for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for the hours they worked in excess of 40 a workweek.

143. Detroit's unlawful conduct harmed Seever and the other Hourly Employees by depriving them of the overtime wages they are owed.

144. Accordingly, Detroit owes Seever and the other Hourly Employees the difference between the wages actually paid and the overtime wages actually earned.

145. Because Detroit knew or showed reckless disregard for whether its bonus pay scheme, pre/post shift off the clock policy, and auto-deduct policy violated the FLSA, Detroit owes Seever and the other Hourly Employees these wages for at least the past 3 years.

146. Detroit is also liable to Seever and the other Hourly Employees for an amount equal to all their unpaid overtime wages as liquidated damages.

147. Finally, Seever and the other Hourly Employees are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

## JURY DEMAND

148. Seever demands a trial by jury on all Counts.

## RELIEF SOUGHT

WHEREFORE, Seever, individually and on behalf of the other Hourly Employees, seeks the following relief:

a. An Order designating this lawsuit as a collective action and authorizing notice to the Hourly Employees allowing

them to join this action by filing a written notice of consent;

b.    An Order finding Detroit liable to Seever and the other Hourly Employees for unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

c.    Judgment awarding Seever and the other Hourly Employees all unpaid wages, liquidated damages, statutory damages, and any and other penalties available under the FLSA;

d.    An Order awarding attorneys' fees, costs, and expenses;

e.    An Order awarding pre- and post-judgement interest at the highest applicable rates; and

f.    Such other and further relief as may be necessary and appropriate.

Date:  October 8, 2025

Respectfully submitted,

**Fagan McManus, pc**

By: _/s/ Jennifer McManus_
Jennifer L. McManus (P65976)
Local Counsel for Plaintiff
25892 Woodward Avenue
Royal Oak, Michigan 48067-0910
Phone: (248) 542-6300
jmcmanus@faganlawpc.com

Michael A. Josephson*
Andrew W. Dunlap*
**Josephson Dunlap llc**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Phone: (713) 352-1100
Fax:    (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch*
**Bruckner Burch pllc**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
Phone: (713) 877-8788
Fax:    (713) 877-8065
rburch@brucknerburch.com

*Pro hac vice applications forthcoming*

**Attorneys for Seever &
the Hourly Employees**